Madam clerk, please call the case. 3-10-0540, Mayos Lake Home Owners Association, Anthony Vickers for Bowling v. Bruno Edold, housed by Ronald E. Bowling. Your Honor. You may. May it please the Court, Mr. Bowling, Your Honor, as this case, as you probably already know, involves our appeal from an injunction, which was issued by the Supreme Court of Iroquois County. The injunction basically said that my client, Bruno Pellick, was enjoined from violating the restricted covenants of Bayos Lake subdivision. We're not sure exactly what that means. And the judge refused to make it more specific, refused to say what specifically we were restrained from doing that was in violation of those covenants. The facts in this case, I think, are basically undisputed, but I want to go over them just a little bit so that the sequence is clear. My client, Bruno Pellick, and B.A. Higgins Development Company, develops real estate. Mr. Pellick first bought 13 lots, subdivided lots, in Bayos Lake subdivision, plus a lot adjacent to them, which was called Outlot B. These lots, except for Outlot B, were 50 foot in width, approximately 100 feet in length. They did not border, they did not adjoin the lake itself. They had sat vacant for at least 50 years, with no development on them, there's no water, no sewer, no utilities to them whatsoever. You can see from the photographs that are in the record that they were overgrown with no water structures on them or anywhere near them. He bought that, those lots, because he also wanted to buy some adjacent ground, which was not in the subdivision, but was owned by Lakeview Country Club. This ground, I think, I don't know, two, three acres, also did not adjoin the lake. There was no water to it, but it adjoined the golf course. The golf course was on the south, and it sat, this lot, this acreage, sat directly to the east and adjoined the 13 lots that my client bought. Before he bought them, however, he went to the Bayos Lake Association, who enforced the and he applied for a permit to build a roadway across Outlot B to access the acreage that he had bought. That permit was granted. So Mr. Pellick, the record shows, went ahead and bought the acreage from Lakeview Country Club. Mr. Pellick then went to Iroquois County to go through the zoning process and the subdivision process and so forth. And when he got to those hearings, a good number of people from the Bayos Lake Lotteries Association, including their directors and officers, appeared at these meetings and objected to approving the plot because the entranceway to the country club property was over Outlot B. And they felt, now felt, that that was inappropriate, environmental reasons. It adjoined a Bayos Lake road that was in the subdivision, and they objected to it. So Mr. Pellick, at that point, changed his plan, changed his plot to show that the entranceway into this ground that he was going to purchase and develop was over one of the plotted lots, Lot 41, which was like two lots away from the one which the country club issued the permit for. The Iroquois County ultimately approved the subdivision plot, the rezoning, including the roadway or the driveway, over Lot 41. Actually, it was a building permit for a culvert and a driveway, wasn't it? It was. That's different from a road, isn't it? Isn't that different from a road? Judge, the record shows, in the minutes of all the meetings, that the board of directors knew that there was going to be a road and that Outlot B was going to be used to access the property that he was buying from the country club. As a matter of fact, several of the minutes, it said point blank. We all knew that this was what Mr. Pellick was doing with Outlot B, was using that to access the country club lots. So at that time, were they country club lots, or was it one piece of property? One piece of property. He developed the property into what he called Curry Dock subdivision, but this was subsequent to his obtaining the permit to access it. Didn't the covenants allow for a road to go through Outlot B? The covenants? There wasn't a restriction for residential use only in Outlot B. That's correct. They could not restrict what was built on Outlot B, but Bales Lake still required a including the culvert that was put out there. So Mr. Pellick then, as I say, bought that. He changed the plat. The plat was approved by the county, and Mr. Pellick, he'd already started his roadway over Outlot B, but he stopped that because of all the complaints that he was getting and decided to go over Outlot, I'm sorry, Lot 41, I think it is. He did that on his own, there's no question about that, and he started building his roadway over Lot 41 to access these lots that he was building and the construction that he planned adjacent to them when this complaint in this case was filed and the trial judge issued an injunction prohibiting, as I said before, us from violating the restrictions of that. The plaintiff in this case, Bales Lake Lot Homeowners Association, relies totally upon this court's decision in 1992 in the Sherwood v. Rigsby case. And it certainly is relevant. It's almost identical except that the roadway in that case was to service eight lots. There was no indication that it was a private road. It was designated, in the opinion, as a public road. And this court, without any authority from other courts or others, made it clear that a residential use will not accommodate a roadway. And reversed the trial court and the injunction was issued prohibiting the building of that driveway over the subdivided lot. This court, however, subsequent to that time, issued an opinion, I think, which at least questions the reasoning behind the Sherwood v. Rigsby case, and that case I cited in my brief, of course, and that is Sadler v. Creekmore, and in that case, it didn't deal with the roadway, but it dealt with subdivision lot, which the parties wanted to subdivide and build a second house on the subdivided lot, where the original restrictions in the, or the covenants said that you could only have one residence on one lot, and the parties in that case dealt with the situation where one of the lot owners subdivided another lot, subdivided one of the lots in the subdivision for the purpose of building another house on it. And this court then said that you can't stop that, because of the fact there is the restricted covenants do not specifically prohibit it. And quoting from the opinion, quote, however, the message in Watts regarding the interpretation of covenants is clear. Restrictions on the use of property must be expressly stated in order to be given effect, and I submit that the restriction about putting a driveway, roadway, public street, or whatever, across a subdivided lot is not within the restrictions, or expressly stated in the restrictions in the subdivision. All that it says is that the lots, except out lots, should be used for residential purposes only. Can you reside in a street? No, but you can't reside in a driveway either, I mean. So is a driveway, that's a residential purpose, I assume that it is. So why it's not a street, or a road, or a driveway that goes from one residential area to another residential area, also residential in purpose. So I suggest, to your honors, that that case, the case relied upon by the plaintiffs, is no longer valid. Sure, sure. Could your, let me ask you this, could your client put a sewage treatment facility on that lot, to service that his subdivision back there? He could, Judge, but there's only three lots back there, and the plan was for each lot to have its own septic, and well, and the like. They're rather large lots. I mean, would that be a residential purpose if you put a sewage treatment facility on that lot? I would do it, I would do it. Yes, sir. It's not restricted, it's not in the covenants that you can't do it. And as this court said, in that later case, that 2005 case, that unless it's in the restrictions, it's not a valid restriction. Because of the concept that a person has the right to use his property as he sees fit. Unless there are restrictions which are reasonable, and clear, and concise. So, sir, you said, I mean, in your opinion, are you saying that this residential use only because this driveway or road and the hypothetical sewer treatment plant are servicing a residential subdivision or a neighborhood that may fall within the restriction? I understand your question, your honor. And I don't think that that would fall into a restriction based upon the language of the covenants, is simply all that I am saying. Counsel, you have two minutes. Okay, thank you. I want to real rapidly move to another area, your honor. What surprised me about the appellate briefs filed by the alleys in this case is that it has to do with the issue of whether my client's ground is landlocked or not. This case at the trial level was always based upon the fact that even though my client owned ground adjacent, that with the injunction to issue and with enforcing the residential requirement strictly, would make his ground landlocked and of no use. We come to this court and the appellees say, well, that ground isn't landlocked, they can still use outlot B. And the brief states that in four or five different places. The outlot B permit was rescinded, your honors, by Bales Lake Lawn Owners Association. And when the injunction was issued, we could not go over either lot to access our property. What about, was there access through the golf course? No, there wasn't. Okay, can they sell you landlocked property? Well, they did in this case, but who would have thought it was landlocked? Because we owned the property next to it, which had access to a township road. So it was a big shock, but it turns out with the injunction that it's landlocked. And now they say in their brief, well, that's not true, we can go through outlot B. Had we known that, things might be a little different. But the whole case was tried upon that basis. And my post-trial motion to the trial judge argued that. She did nothing with it, she didn't deal with it, she didn't confront it whatsoever. And after the case was over and the notice of appeal was filed in this case, the plaintiff actually filed a petition to hold us in contempt for two reasons. One, we were using outlot B as a roadway without a permit. And two, we didn't take up the roadway that was installed over lot 41. Okay, thank you. That petition has not been heard yet, but it's reflected in the minutes. And I may have to move to supplement the record of the petition up here. Thank you, counsel. Thank you, judge. Counsel. Good afternoon, your honors. May it please the court, Mr. Boyer. I'm Christopher Bullen, I'm here on behalf of the plaintiffs, the apologies of the case, the Bales Lake Subdivision Homeowners Association. The facts in the case, while essentially are not disputed, have some issues that both parties certainly have a different spin on. The parties introduced in the evidence in this case, the contracts to purchase the land in question. Parties also introduced in the evidence in this case, the deeds which actually conveyed the property in question. The significance of that is the defendant placed the land under contract regarding the golf course subdivision. And then came to the Bales Lake Subdivision Homeowners Association and asked to annex that property to the subdivision. That petition or request was denied by the subdivision owners association. He then returned while the property was still under contract and sought the building permit to build the culvert and driveway across outlot B. That building permit was granted. It had an expiration date, as most building permits do, but it was granted. The defendant then went before the Iroquois County Planning Authorities, the Zoning Board of Appeals, the Planning Board, and then- Was that permit ever rescinded? That permit was never rescinded. It expired, but it was never rescinded. There was a motion made, if you look in the board minutes that were provided in the evidence, to rescind it. The motion died for lack of a second, according to the minutes. Now, there's a lot of discussion, but discussion is not action. Legislative bodies talk a lot, but they don't necessarily act every time they talk, consistent with what's said by the individual members. And in this case, the motion to rescind was made, died for lack of a second, and it was never rescinded. And that's an issue that exists between the understanding and the facts of the plaintiff and the defendants in the case. In the planning process, there was substantial dispute and substantial disagreement, some by owners, some by other residents of the Bales Lake subdivision, some by the county board members, some by Zoning Board of Appeals members, and the issue of Outlaw B and the suitability of Outlaw B as an access street to a subdivision was raised. And during the course of that process, the defendant, of his own choice, his own volition, and according to his engineer, the engineer's recommendation, abandoned Outlaw B as a point of access. And with them, and ultimately planted, Lot 41 is his point of access. Without any going back, without ever going back to the Bales Lake Subdivision Homeowners Association Board, and asking their involvement in that decision. He made that of his own decision and abandoned Outlaw B. Thereafter, after he'd already planted the subdivision, gone to the Iroquois County Board, then he closed on the transaction based upon his using Lot 41 as his point of access. Now, throughout the briefs of the defendant in the case, he argues that this is a private gravel driveway. Well, by subdivision ordinance in Iroquois County, it cannot be either a private or a gravel driveway. It has to be a paved road because it's an access to a three lot subdivision. An access for their cars, for their visitors and guests, and an access for emergency purposes. You can't use a private gravel driveway as an access to a subdivision in Iroquois County, and we've cited the ordinances that provide that. So the issue then is, is this as an access road in violation of the restricted covenants of the subdivision? And when he applied for a building permit for Lot 41, he was told this is a violation across Lot 41 of the restricted covenant, because the restricted covenant says you can use this lot for residential purposes only. What was denied in May of 07, correct? Correct. The request for what? Correct. It was denied. It was denied. Construction started June of 08. That's correct. June, he went ahead and started construction across Lot 41, even though he had no building permit. And in fact, a trial denied he even needed a building permit, even though it requested it. And the issue of gravel and paved and so forth became an issue. Apparently, that contention is no longer before this court. From the plaintiff's perspective, from Bales Lake Subdivision Homeowners Association, this is precisely the issue that this court decided in Sherwood versus Briggs. It's rare in my now seeming longer and longer years of experience in a trial court that we can find a case that is almost, and I think in this case, on all fours to try a case two. And that's exactly what this case is. Sherwood versus Rigsby had exactly the same language in the restricted covenants, had exactly the same intended use that was being sought. And the court made what we consider the binding decision of saying you cannot use a residential lot which is defined for use restricted covenant, defines it for residential purposes only. And use that as an access lot to another subdivision. This is consistent, as we cite in the court, in the brief with the fourth district decision in the Williams versus Bloomington case. Or the Bloomington case, wherein there the court was looking at a zoning ordinance, not a restrictive covenant, that said you couldn't put an access road across the end of a cul-de-sac to an apartment complex. But that use of that lot was not for residential purposes. The defendant has cited a number of out of state cases, but I don't think those are relevant. When you have a case on point and a case decided in the state of Illinois and also supported by an additional case in the state of Illinois from a different district for the same purposes. The defendant also argues that equity should mount in favor of the defendant and against the plaintiffs. We cite and note and argue that enforcement of restrictive covenant itself is sufficient to issue an injunction without any showing of injury whatsoever. Now the defendant claims that we're now stating for the first time that this property is not landlocked. No, we stated that in the trial court. That's why we introduced the drawings produced by the defendant himself, showing a subdivision that was accessed through the golf course property to the south. That's why that was introduced. And in fact, we introduced the testimony of Mr. Neiman, who testified that the issue had not been raised to him, other than the fact that there had been, not being landlocked, but he thought perhaps the issue had been raised discussions about access being provided. So the position of the plaintiff in the case, that the property is, if it's landlocked, is landlocked as an issue between the defendant and the golf course and the country club. That should be dealt with by them. That's not the burden of the plaintiff in this case, who had nothing to do with either the negotiations or that transaction. And at the point that the ultimate decision to purchase the conveyance occurred, the plaintiff or the defendant had abandoned the building permit that had been issued by the plaintiff in this case. So equities on this case don't favor the defendant. The defendant then goes on to say, well, if we don't have equities and we violate the restricted covenant, we should still be here on the basis that we have a vested right. However, one has to look at the facts again to determine whether the vested right doctrine applies in this case. The defendant argues that since there is nothing that says you can't build an access road to the restricted covenants, it's not restricted and relies upon the Sandler case. The Sandler case really has no application here because that deals with somebody using the language and creatively subdividing a piece of property in order to accommodate and meet the restricted covenants. An old maxim that I remember, but I don't remember my Latin well enough to repeat it in Latin, is to express one option, all others are excluded. The restricted covenant in this case says residential purposes only. In this case, the defendant was given a permit to build a culvert and driveway across outlot B. It is the defendant that made the choice to abandon that permit. He made the choice to go across lot 41. Nobody had ever said to the defendant, if you change from outlot B to outlot 41, we'll give you a permit. There's no evidence to that at all. In fact, he didn't even consult with the board to talk about that option. So he can't show that there's a probability of issuance of this permit by any evidence in this case, and he can't show that there's any change in his position as a result of anything done by the Bales Lake Homeowners Association Board. We believe that the order entered herein is sufficiently clear. The entire case was tried on the question of the building of the road across lot 41. It is true that subsequent to that, he continued work on lot 41, subsequent to the court's order, and we filed a petition that remains pending, pending the decision of this outcome, or pending the outcome of the decision of this court. It's the position of the Bales Lake Homeowners Association that the restricted covenant exists for a reason. It applies in this case, and therefore, the injunction was properly issued and should be affirmed. Thank you very much. Thank you, Counsel. Counsel? Mr. Court, again, I need to answer very briefly only one or two of the points raised by Mr. Boland, and that is the issue as to whether or not we could still use outlot B to get back to this subdivision, and I say now we probably can because they have said throughout their brief that we could, that that permit was never rescinded in any fashion. But it died a natural death, didn't it? Well, it may have. That's probably what they are going to argue, but if we try to use it, they're probably going to say that it died because of time. You didn't use it during the time period, did you? Yes, sir. We built it. You started to build it? Built it forward and put it on a gravel roadway, yeah. And you finished it? Did you finish it? No, it wasn't finished yet at all, but it could have been finished and it could have been used in the condition that it was. It's just rock poured in a wooded area wide enough for a vehicle to get through is all that it is. But, you know, even in the petition for a rule that Mr. Boland filed after this case was over, they say in that that we have constructed a roadway across outlot B without first requesting a building permit in violation of the regulations of Bales Lake homeowners, and then they say that we're in contempt because we've continued to use the roadway across lot 41. This case, Judge, needs clarification, particularly from the trial judge, and she refused to do it, as to what specifically we're enjoined from doing. Well, what's vague about the order? What are you having trouble with? What's your client having trouble with? Whether she enjoined us from going over outlot B or whether she enjoined us from going over outlot 41. She just said we're enjoined from violating any restrictions, just as she could have said you're enjoined from violating the law. Well, outlot B doesn't have a residential use restriction, does it? No, it does not, but the association believes that they have the right to control the use of that property by virtue of the fact they apparently require a permit. We got a permit once. We got it once. That's right. But that was rescinded. That was even rescinded. Well, it lapsed. It was rescinded, Judge, and I would refer your honor to Plaintiff's Exhibit Number 17. In the record, it's the minutes of the Lot Owners Association dated September 26, 2007, and there's an amendment of the meeting, of an earlier meeting, which is attached to those minutes as Exhibit Number B, and in that the meeting was amended where the permit was issued to show that the permit was only issued for the purpose of us going on the lot and not for going through the lot to get to our own property. It's clear it was rescinded. You know, at the trial level, the fight was over Lot 41, wasn't it? Partially, yeah, or mostly, yes. We wanted to go over Lot 41. I mean, that's what the issue was, wasn't it? That's what the issue was. And that's what the judge ruled on. But also, the issue was, was the hardship by preventing us from going over Lot 41, did it outweigh any benefits to the plaintiff as a matter of equity? Because we were landlocked. And there was some testimony given at the trial that there was a, one time, perhaps a plan that the country club would give us access to those lots next to a green that was on the golf course. The golf course. You got that from somebody else, didn't you? The lot you're trying to get to. The lot that we're trying to get to go to 41? Yeah, we bought that from somebody else. Exactly. That's what we have one minute. Okay. So, judges, I think the record is clear in this case. The plaintiff is, for reasons unknown, reasons never revealed, are set against Mr. Pellick developing that country club property. They've never shown me why. They've never shown any advantage to them by enforcing that restriction whatsoever. And the result of that attitude on their part has resulted in my client losing the value of his property. No one can get to it. It is absolutely useless with that injunction in place. Thank you very much. Thank you, counsel. Thank you. Thank you to the attorneys, and we'll take this case under advisement and rule of dispatch, and we'll now take a short recess for a panel change.